**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **BJB ELECTRIC, L.P.,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **No. 09 C 3022** |
| **v.** | ) | |
| | ) | **Judge Joan H. Lefkow** |
| **NORTH CONTINENTAL** | ) | |
| **ENTERPRISES, INC.,** | ) | |
| | ) | |
| | ) | |
| **Defendant.** | ) | |

**OPINION AND ORDER**

BJB Electric, L.P. ("BJB Electric") filed suit against North Continental Enterprises, Inc.

("North Continental") seeking to recover amounts due under several invoices for the purchase of

goods.  North Continental counterclaimed for breach of two alleged distributorship agreements

and violation of the Wisconsin Fair Dealership Law, Wisc. Stat. § 135.01, *et seq.*  Before the

court is BJB Electric's motion for summary judgment as to all counts of the complaint as well as

North Continental's counterclaims.  For the following reasons, the motion [#128] will be granted

in part and denied in part.

**LEGAL STANDARD**

Summary judgment obviates the need for a trial where there is no genuine issue as to any

material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P.

56(a).  To determine whether any genuine issue of fact exists, the court must pierce the pleadings

and assess the proof as presented in depositions, answers to interrogatories, admissions, and

affidavits that are part of the record.  Fed. R. Civ. P. 56(c) & advisory committee's notes.  The

party seeking summary judgment bears the initial burden of proving that there is no genuine

issue of material fact. *Celotex Corp*. v. *Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986). In response, the nonmoving party cannot rest on mere pleadings alone but must use the evidentiary tools listed above to designate specific material facts showing that there is a genuine issue for trial. *Id.* at 324; *Insolia* v. *Philip Morris Inc.*, 216 F.3d 596, 598 (7th Cir. 2000). A material fact is one that might affect the outcome of the suit. *Insolia*, 216 F.3d at 598–99. Although a bare contention that an issue of fact exists is insufficient to create a factual dispute, *Bellaver* v. *Quanex Corp.*, 200 F.3d 485, 492 (7th Cir. 2000), the court must construe all facts in a light most favorable to the nonmoving party and draw all reasonable inferences in that party's favor. *Anderson* v. *Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S. Ct. 2505, 91 L. Ed.2d 202 (1986).

## BACKGROUND[1]

### I. BJB Electric and North Continental

BJB Electric is engaged in the sale of components for the appliance and lighting industries, primarily components manufactured by its German affiliate BJB GmbH & Co. KG ("BJB Germany"). BJB Electric is a Georgia limited partnership with its principal place of business in Ringgold, Georgia. BJB Electric's limited partner is BJB Beteiligungs GmbH ("BJB

---

[1] The facts set forth in this section are derived from the statements of fact and supporting documents submitted by the parties to the extent they are relevant, supported by admissible evidence, and comport with Local Rule 56.1. They are taken in the light most favorable to North Continental. Where North Continental has denied a statement of fact but failed to cite any portion of the record in support of its denial, *see* Def.'s Resp. to Pl.'s L.R. 56.1 Stmt. ¶¶ 20, 25, the court has deemed the statement of fact admitted. *See* L.R. 56.1(b)(3) (opposing party's response to moving party's statements of fact must include, "in the case of any disagreement, specific references to the affidavits, parts of the record, and other supporting materials relied upon"). North Continental's statements of fact have been disregarded to the extent that they assert legal conclusions. (*See* Def.'s L.R. 56.1 Stmt. of Fact ¶ 16 ("BJB Electric wrongfully rescinded and recalled the assignment of many of the small customers that NCE was supposed to service under the contract.").

Investment Germany"), a German entity with its principal place of business in Germany.  BJB

Electric's general partner is BJB USA Corporation, a Georgia corporation with its principal

place of business in Ringgold, Georgia.  BJB USA Corporation is owned by BJB Beteiligungs

und Verwaltungsgesellschaft mbH Arnsberg ("BJB Investment and Management Germany").

North Continental is a Michigan corporation with its principal place of business in Niles,

Illinois.[2]

## II.    The Appliance Agreement

In the mid to late 1980's, Lasse Koerm, who is North Continental's sales manager,

performed consulting work for the company that is now BJB Germany.  North Continental

helped introduce BJB Germany to lighting and appliance manufacturers in North America and

assisted BJB Germany in developing new products for appliance manufacturers.  At around this

same time, in return for North Continental's assistance, BJB Germany agreed that North

Continental could distribute and sell its appliance components in North America.

North Continental and BJB Germany entered into an appliance component distribution

agreement in Germany (the "Appliance Agreement").  Pursuant to the Appliance Agreement,

North Continental was entitled to sell appliance components to all but a dozen large

manufacturers in North America who were being serviced by a second representative of BJB

Germany.  The Appliance Agreement was memorialized in a series of written exchanges,

---

[2] BJB Electric's complaint bases federal jurisdiction on diversity of citizenship.  Because BJB Electric is a limited partnership, its citizenship is determined by that of its general and limited partners. *See Market Street Assocs. Ltd. P'ship* v. *Frey*, 941 F.2d 588, 589 (7th Cir. 1991). BJB Electric is accordingly considered a citizen of both Georgia and Germany.  Because North Continental is a Michigan corporation with its principal place of business in Niles, Illinois, the parties' citizenship is completely diverse. In addition, the amount in controversy is alleged to exceed $75,000.  Jurisdiction is therefore proper under 28 U.S.C. § 1332.

although the record does not disclose the date or contents of the writings.[3] It is uncontested, however, that BJB Electric did not exist at the time when North Continental and BJB Germany entered into the Appliance Agreement.

North Continental conducted business pursuant to the agreement for twenty-five years.[4] The Appliance Agreement does not have any provisions regarding duration, geographic scope, pricing, sales quotas, performance measurements, or minimum purchase levels. Koerm believed that the Appliance Agreement was governed by German law.

## III. The Lighting Agreement

In 2005, BJB Electric asked North Continental to act as its exclusive distributor in North America for its lighting industry products and to service smaller lighting customers. BJB Electric initially proposed that North Continental would be the exclusive distributor for customers with annual sales of $30,000 or less, but this dollar volume figure was later reduced to $20,000 and was never included in a final agreement.

On March 28, 2006 representatives from BJB Electric and North Continental signed a written distribution agreement for lighting components (the "Lighting Agreement"). Koerm signed on behalf of North Continental. Michael Thompson, BJB Electric's former president, signed on behalf of BJB Electric.

---

[3] It is also unclear whether the written exchanges were between North Continental and BJB Germany or North Continental and BJB Electric. North Continental's Local Rule 56.1 Statement of Facts and the affidavit of Lasse Koerm refer only to a series of "written exchanges between the parties." (Def.'s L.R. 56.1 Stmt. of Fact ¶ 11.) It is not clear from the context whether "the parties" refers to the parties to the Appliance Agreement, *i.e.*, BJB Germany and North Continental, or the parties to this litigation, *i.e.*, BJB Electric and North Continental.

[4] North Continental asserts that the agreement was reflected in a "continuous course of dealing between the parties" that was in effect for almost twenty-five years. (Def.'s L.R. 56.1 Stmt. of Fact ¶ 11.) Again, it is not clear what entities North Continental intends to refer to when it uses the phrase "the parties."

The Lighting Agreement appoints North Continental as BJB Electric's "exclusive distributor" for the sale of specified lighting components in the United States. (Second Kauke Decl. Ex. 2, ¶ 2.1.) The agreement provides that BJB Electric will not supply products to any authorized customers in the United States, with the exception of specified customers referred to as "excluded customers." (*Id.* ¶¶ 2.1, 2.2.) Schedule 5 to the Lighting Agreement purports to list the excluded customers, which were large customers and potential customers that would be reserved for BJB Electric to work with. Sixteen companies are listed on Schedule 5. (*Id.* at Schedule 5.)

At the time the Lighting Agreement was signed, Koerm and Thompson knew that the list of customers on Schedule 5 was incomplete. Koerm testified that the following exchange occurred before the agreement was executed:

> I looked at that Schedule 5 and said, you know . . . something is wrong here. You have only 20 customers, 15 to 20 customers as exclusive customers. Where is the rest?

> I had thought there would be 200. There are about 2,300 to 3,000 I think customers in North America. And Michael Thompson is a very calm person and I think it's the only time I have seen him angry. He looked at Tom Shaffer [another BJB Electric employee] and he said, "Where are the rest?" . . . .

> And [Shaffer] said, "Computer glitch." And Michael Thompson said, "Well, will you take care of it?" And he said, "Yes. I'll fix it. I'll take care of it."

> And I figure it's not my problem. I'll sign the agreement. . . .

> I looked at this that Tom Shaffer would get back and make corrections to it, and I would agree to those corrections. There was a matter of, you know, making some corrections to it.

(Koerm Dep. at 94–95.) Koerm further testified that, at the time he signed the Lighting

Agreement, "I knew that I did not consider [the list to be] complete and Michael Thompson

didn't." (*Id.* at 96.)

Thompson also testified that at the time the Lighting Agreement was executed he did not

believe that the list of companies included on Schedule 5 was complete. Thompson stated,

"[W]e [BJB Electric] had not established who the customers that we had at that time that we

were going to hand over to NCE [and] we didn't know which ones could be added" to Schedule

5. (Thompson Dep. at 50.)

BJB Electric told North Continental that it would provide an amended, longer, list of

exclusive customers under the Lighting Agreement. It never did so.

After the Lighting Agreement was signed, BJB Electric and North Continental continued

to reallocate lighting components customers between them. BJB Electric provided North

Continental with a "Small Customer List" that designated which customers were assigned to

North Continental. BJB Electric's understanding was that it had the discretion to remove

customers from the "Small Customer List," depending on factors such as the growth of the

customer or customer needs and demands. For example, in May 2006 BJB Electric wrote North

Continental and stated that it had discovered that "a few companies included in the list of those

transferred to NCE . . . should not have been included." (Koerm Dep. Ex. 10.) BJB Electric

asked North Continental to delete Stylemark, Inc., from its list of companies, and North

Continental complied. (*Id.*; Koerm Dep. at 115–17.) Another customer, MMJ Lighting,

requested that it be re-established as a direct customer of BJB Electric, rather than work

indirectly through North Continental. BJB Electric indicated that it intended to work directly

with MMJ Lighting to keep it as a customer. BJB Electric recalled the assignment of other small customers that had purportedly been assigned to North Continental under the Lighting Agreement. North Continental, unlike BJB Electric, believed that BJB Electric was wrongfully recalling customers that had been exclusively delegated to North Continental under the terms of the Lighting Agreement.

BJB Electric terminated the Lighting Agreement on December 31, 2007 and took over the small customer accounts that North Continental had developed and serviced while the agreement was in effect.

## IV. BJB Electric's Shipment of Poor Quality Goods

In 2007 and 2008, BJB Electric sent several shipments of poor quality goods to North Continental. North Continental's customers complained about the quality of the goods and returned the products for North Continental's review and to obtain a credit. North Continental was forced to perform a quality check on every assembly shipped by BJB Electric. As a result, North Continental incurred substantial freight and labor charges.

During this same time period, BJB Electric failed to supply its assembly model 77.914 on time. The delay forced a customer to shut down its production line. BJB Electric then began to supply goods to the customer directly and North Continental was not able to obtain its expected profits from selling goods to that customer.

North Continental has sent debit invoices to BJB Electric totaling $66,083.24 to recoup the expenses associated with the quality checks and lost profits.

## V.      Re-Negotiation of the Appliance Agreement

Shortly after BJB Electric terminated the Lighting Agreement, and continuing until approximately February 2009, BJB Electric sought to renegotiate a new Appliance Agreement with North Continental.  The negotiations were conducted in German, between BJB Germany and North Continental.  Representatives from BJB Electric were present but were not able to understand the negotiations.  No agreement was signed or finalized.

## VI.     BJB Electric's Unpaid Invoices for Appliance Components

North Continental regularly ordered appliance components from BJB Electric by updating purchase orders that it faxed or e-mailed to BJB Electric.  BJB Electric would then process and fill the orders in Ringgold, Georgia.  The goods were shipped to North Continental with the designation F.O.B. Ringgold.

From November 2008 through January 2009, during the same period that the new Appliance Agreement negotiations were taking place, BJB Electric either stopped or interrupted product shipments to North Continental by demanding payment of all outstanding invoices. Before, North Continental had customarily paid BJB Electric's invoices anywhere from 70 to 140 days after delivery.  The cancellation of the Lighting Agreement and BJB Electric's decision to stop and interrupt the shipment of goods adversely affected North Continental's cash flow, and North Continental was not able to pay the outstanding invoices in full.

Between November 18, 2008 and March 25, 2009, BJB Electric sent North Continental five invoices reflecting orders from North Continental for appliance components.  The invoices total $182,178.60 and payments were due sixty days from the dates of the invoices.[5]  North

---

[5] BJB Electric asserts that the invoices total $182,178.56, however the invoices attached as Exhibit B to BJB Electric's Local Rule 56.1 statement of fact total $0.04 more.

Continental did not pay the invoices on time but later issued credit memos to BJB Electric totaling $2,146.15.

In March and April 2009, BJB Electric halted further shipments of products to North Continental and refused to respond to North Continental's communications. As a result, North Continental stopped payment on a check for $61,872.39 that had been made to BJB Electric for partial payment of the outstanding invoices.

## ANALYSIS

### I. North Continental's Counterclaims[6]

### A. Breach of the Appliance Agreement

North Continental claims that BJB Electric breached the Appliance Agreement by selling directly to customers that the agreement designated for North Continental. BJB Electric disputes the validity of the alleged Appliance Agreement, arguing that the agreement was an oral agreement now barred by the statute of frauds or is unenforceable because it lacks essential terms required under Illinois or Georgia law. North Continental responds that the parties' "written exchanges" and "course of dealing" satisfied the statute of frauds and provided the essential terms of the contract. It further argues, inconsistently with this line of reasoning, that the Appliance Agreement is governed by German law and that German law does not recognize an equivalent to the statute of frauds or require definite written terms. North Continental concludes that "regardless of the fact that the Appliance Agreement was oral and terms not yet defined," the Lighting Agreement was valid under German law.

---

[6] All counterclaims referenced in this section are from North Continental's first amended counterclaim. (*See* Dkt. #44.)

The court need not delve into these issues in detail because, as North Continental concedes, BJB Electric is not a party to the alleged Appliance Agreement. All of the evidence indicates that any agreement was with BJB Germany. So far as the record discloses, BJB Electric and BJB Germany do not have any formal legal affiliation. BJB Germany is not BJB Electric's general or limited partner and there is no evidence that BJB Germany has an ownership or management interest in either BJB USA Corporation or BJB Investment Germany.

North Continental asserts that BJB Electric can be held liable for breach of the Appliance Agreement because it is "controlled" by BJB Germany and "[a]t the very least . . . is an alter ego or shell company of BJB Germany." (Def.'s Mem. at 8–9.) North Continental does not cite any supporting legal authority from German law, which governs the organization and internal affairs of BJB Germany, or Georgia law, which governs the organization and internal affairs of BJB Electric. Nor does it cite to any relevant principles of third party contract liability. North Continental's evidentiary support is equally thin. It merely cites Thompson's deposition testimony that he "answered to . . . a number of people in Germany" while he was president of BJB Electric. (Thompson Dep. at 17.) Even if a finder of fact were to conclude that the "people in Germany" referred to in Thompson's testimony worked for BJB Germany (rather than one of the other German affiliates), the testimony does not indicate that BJB Electric was a mere shell company. The court can conceive of no theory of contractual liability that could be supported by these facts. Moreover, "[i]t is not the obligation of this court to research and construct the legal arguments open to parties, especially when they are represented by counsel." *United States* v. *Hook*, 195 F.3d 299, 310 (7th Cir.1999) (quoting *Kauthar SDN BHD* v. *Sternberg*, 149 F.3d 659,

668 (7th Cir. 1998)).  BJB Electric's motion for summary judgment as to Count I of North Continental's counterclaims will be granted.

**B.      Violation of the Wisconsin Fair Dealership Law**

North Continental claims that BJB Electric violated the Wisconsin Fair Dealership Law by terminating the Appliance Agreement without good cause.[7]  The Fair Dealership Law provides that "[n]o grantor . . . may terminate, cancel, fail to renew or substantially change the competitive circumstances of a dealership agreement without good cause."  Wisc. Stat. § 135.03. A "grantor" is defined as "a person who grants a dealership," and "dealership" is defined, in relevant part, as a "contract or agreement . . . by which a person is granted the right to sell or distribute goods or services." *Id.* §§ 135.02(2) & (5).  BJB Electric cannot be considered a "grantor" under the Fair Dealership Law because, as discussed above, it was not a party to the Appliance Agreement.  Therefore there is no genuine issue of material fact as to whether BJB Electric violated Wisconsin's Fair Dealership Law.  BJB Electric's motion for summary judgment as to Count III of North Continental's counterclaims will be granted.

**C.      Breach of the Lighting Agreement**

Finally, North Continental claims that BJB Electric breached the lighting agreement by dealing directly with customers that were reserved exclusively for North Continental.  BJB Electric has moved for summary judgment on the ground that the agreement is unenforceable because there was no mutual assent.

---

[7] North Continental's counterclaim alleges that BJB Electric violated the Fair Dealership Law by selling directly to North Continental's customers, in violation of the Lighting Agreement and Appliance Agreement, and by failing to renew the Lighting Agreement and Appliance Agreement.  North Continental does not make any argument relating to these allegations in response to BJB Electric's motion for summary judgment.  Therefore any claims arising from these allegations have been forfeited.

The court applies Georgia law, in accordance with the agreement's choice of law provision and in the absence of any argument that the provision contravenes a fundamental policy of Illinois or that the choice of Georgia law does not have a reasonable relationship to the parties or the transaction. *See WTM, Inc.* v. *Henneck*, 125 F. Supp. 2d 864, 867 (N.D. Ill. 2000); *Hengel, Inc.* v. *Hot N'Now, Inc.*, 825 F. Supp. 1311, 1315 (N.D. Ill. 1993) (Williams, J.). To create a valid contract under Georgia law, "there must be parties able to contract, a consideration moving to the contract, the assent of the parties to the terms of the contract, and a subject matter upon which the contract can operate." Ga. Code Ann. § 13-3-1. Georgia courts apply an "objective theory of intent" in determining whether there was mutual assent. *Turner Broad. Sys., Inc.* v. *McDavid*, 693 S.E.2d 873, 878 (Ga. Ct. App. 2010) (citation omitted). This means that the parties' outward conduct, not their secret intentions, determines whether there was mutual assent. *Id.*; *Leone Hall Price Found.* v. *Baker*, 577 S.E.2d 779, 782 (Ga. 2003); *see also* 1 Richard A. Lord, *Williston on Contracts* § 3:4 (4th ed.). The court may consider extrinsic evidence of the circumstances surrounding the making of the contract, such as correspondence and discussions, in determining whether there was mutual assent. *Turner*, 693 S.E.2d at 878.

BJB Electric cites the deposition testimony of Koerm and Thompson to support its assertion that the parties did not reach a final agreement on the list of companies that BJB Electric could contact directly. Koerm testified that he had thought there would be 200 companies on the list, rather than the sixteen companies listed on Schedule 5. He stated that he knew that the list of companies was incomplete and that he knew that Thompson, at BJB Electric, considered the list to be incomplete. Thompson likewise testified that he believed that

Schedule 5 was incomplete when he executed the agreement on behalf of BJB Electric and that BJB Electric had not determined which companies should be on the list at that time.

North Continental argues that the parties agreed on which customers would be served by North Continental under the Lighting Agreement, even though they knew that this agreement was not reflected in Schedule 5. In support, North Continental cites Koerm's affidavit, prepared after his deposition, wherein Koerm attests, "Both NCE and BJB Electric understood which customers were to be served by NCE under the lighting agreement. There was a joint understanding of the allocation of customers between NCE and BJB Electric." (Koerm Aff. ¶ 17.) There are two problems with Koerm's affidavit that warrant its exclusion from consideration.

First, the affidavit does not demonstrate that Koerm's statement regarding BJB Electric's "understanding" of the contract is based on personal knowledge. *Cf.* Fed. R. Civ. P. 56(c)(4) ("An affidavit or declaration used to support or oppose a motion must be made on personal knowledge . . . and show that the affiant or declarant is competent to testify on the matters stated."). Rule 56's requirement that affidavits be based on personal knowledge means that an affiant's "inferences and opinions must be grounded in observation or other first-hand personal experience." *Visser* v. *Packer Eng'g Assocs., Inc.*, 924 F.2d 655, 659 (7th Cir. 1991) (en banc). Koerm provides no factual basis to support his conclusion that BJB Electric had the same understanding of the Lighting Agreement as North Continental. Koerm was not an employee of BJB Electric and does not suggest that he was privy to BJB Electric's internal discussions regarding the meaning of the Lighting Agreement. To the contrary, Koerm testified that he "did not really negotiate" the Lighting Agreement with BJB Electric: "We have dealt with BJB for a

long time and I always felt that if your principal supplier asks you to do something we will try to do it. . . .  We had no interest in the Lighting Agreement, absolutely nothing." (Koerm Dep. at 86–87.)  Koerm's statement regarding BJB's understanding or interpretation of the Lighting Agreement must be stricken because it is not based on personal knowledge.  *See Rudnicki* v. *WPNA 1490 AM*, No. 04 C 5719, 2009 WL 4800030, at *6 (N.D. Ill. Dec. 10, 2009).

Second, Koerm's statement is inconsistent with his prior deposition testimony.  At his deposition, Koerm was asked, "[D]id NCE have any discussions about the terms of this Lighting Agreement with BJB Electric before it was signed?" (Koerm Dep. at 92.)  Koerm responded, "Just in the sense about where the cutoff of customers should be." (*Id.*)  Koerm was then asked "what specifics" he remembered about the cutoff number.  Koerm responded that sales volume cutoff was changed from $30,000 to $20,000 and that there was "vacillation" prior to the execution of the Lighting Agreement.  (*Id.* at 93.)  Koerm concluded, "This hadn't really been fully reviewed I think, not by BJB in Germany, not in Ringgold." (*Id.*)  This testimony shows that North Continental and BJB Electric had not reached an agreement on the final list of customers prior to the signing of the Lighting Agreement.  Koerm was also asked whether he discussed the terms of the Lighting Agreement with Thompson or Shaffer "at the time it was signed." (*Id.* at 90.)  He responded, "No.  As I said before, I had no input in it." (*Id.* at 91.)  Koerm further testified that he understood that Shaffer would make corrections to the list "and I would agree to those corrections." (*Id.* at 95.)  Thus, Koerm's testimony also shows that North Continental and BJB Electric did not reach an agreement at the time the Lighting Agreement was signed.  Koerm's statement that BJB Electric and North Continental had a joint understanding regarding the allocation of customers under the Lighting Agreement will be stricken because it is

14

inconsistent with his prior deposition testimony. *See Amadio* v. *Ford Motor Co.*, 238 F.3d 919, 926 (7th Cir. 2001).

The facts properly framed, and all reasonable inferences drawn in favor of North Continental, the record supports the conclusion that BJB Electric and North Continental agreed to enter into a lighting distributorship agreement. There is no evidence, however, that they agreed on the way in which lighting customers would be allocated between them. Under these circumstances, the Lighting Agreement's provision relating to the allocation of customers does not create an enforceable obligation. *See Cox Broad. Corp.* v. *Nat'l Collegiate Athletic Ass'n*, 297 S.E.2d 733, 737–38 (Ga. 1982) (provision in a written and executed agreement not enforceable because it was clear that when the parties entered into the contract they did not agree as to what they intended by the language in the provision); *Fonda Corp.* v. *S. Sprinkler, Co.*, 241 S.E.2d 256, 259–60 (Ga. Ct. App. 1977) (where each party to an agreement intended to install a dry sprinkler system, but there was no common understanding as to what the system's component parts would be, there was no enforceable contract between the parties). Unlike cases where the parties cited conflicting evidence as to whether they agreed on various terms of a contract, here the record is clear that neither BJB Electric nor North Continental believed that Schedule 5 listed all of the companies that would be reserved for BJB Electric and, moreover, that neither party had a clear understanding of what companies should have been listed on Schedule 5 at the time the agreement was signed. *Cf. Turner*, 693 S.E.2d at 881 (where parties pointed to conflicting evidence as to whether they agreed on all material terms of the contract, the issue of whether there was mutual assent was a question for the jury); *Lofty* v. *Fuller*, 477 S.E.2d 30, 31 (Ga. Ct. App. 1996) ("The fact that the plaintiff and the defendant differed in their

15

testimony as to the terms of the contract is not sufficient to show that their minds had never met, but simply raised a conflict in the evidence as to what was the contract between the parties." (citation omitted)).[8]  Accordingly, BJB Electric's motion for summary judgment as to Count II of North Continental's counterclaims will be granted.

## II.      BJB Electric's Complaint[9]

### A.      Suit on Open Account and Breach of Contract

BJB's suit for open account and breach of contract claim are premised on North Continental's failure to pay the five outstanding invoices for goods.  Both are contract claims.  *See* 1 Am. Jur. 2d Accounts & Accounting § 8; 67 Am. Jur. 2d Sales § 100.

In the absence of any choice of law provision in a contract, the court applies the choice of law rules of the forum state to determine which state's substantive law governs a contract in a diversity case.  *Klaxon Co.* v. *Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496, 61 S. Ct. 1020, 85 L. Ed. 1477 (1941).  Illinois courts apply the "most significant contacts" test.  *Hinc* v. *Lime-O-Sol Co.*, 382 F.3d 716, 719 (7th Cir. 2004).  Under this test, the relevant contacts are the place of contracting, the place of negotiations, the place of performance, the location of the subject matter of the contract, and the domicile, residence, place of incorporation, and business of the parties.

---

[8] North Continental suggests that the court should conclude that the allocation provision became enforceable because of the parties' later course of conduct.  The one case cited by North Continental does not support its position.  *See Kitchen* v. *Insuramerica Corp.*, 675 S.E.2d 598, 601–03 (Ga. Ct. App. 2009) (reversing grant of summary judgment because the parties had agreed to the material term at issue in the contract dispute, even though other non-material terms were missing).  Moreover, North Continental does not cite any evidence indicating that the parties subsequently reached an agreement as to how lighting customers should be allocated.  *Cf. Terry Hunt Constr. Co.* v. *AON Risk Servs., Inc.*, 613 S.E.2d 165, 169 (Ga. Ct. App. 2005) (where parties presented conflicting evidence as to whether their course of dealing showed assent to renewing a retainer agreement, the evidence should have been submitted to the jury).

[9] The claims referenced herein are from BJB Electric's amended complaint.  (*See* Dkt. #13.)

*Id.* Here, Georgia has the most significant contacts with the alleged contracts. The purchase orders were received, processed, and fulfilled by BJB Electric in Georgia. North Continental also took possession of the goods in Georgia. Finally, BJB Electric is a Georgia limited partnership with its principal place of business in Georgia. The only contact with Illinois is that North Continental's principal place of business is in Illinois. Accordingly, the court will apply Georgia law to these claims.

Neither party discusses the legal principles that govern BJB Electric's suit on open account or claim for breach of contract. North Continental is liable to BJB Electric under either theory of relief, however. "An action for an open account on invoice is an action on implied contract where the seller fully performed on a unilateral contract by delivery of the goods and where the purchaser either expressly or impliedly promised to pay by acceptance of the goods shipped." *Imex Int'l, Inc.* v. *Wires Eng'g*, 583 S.E.2d 117, 120 (Ga. Ct. App. 2003). The contract is used as evidence of a debt, rather than the basis for liability as in a contract claim. *See Chatham Abattoir & Packing Co.* v. *H.K. Painter Eng'g Co.*, 111 S.E. 82, 83 (Ga. Ct. App. 1922) ("In such a suit [on open account], the contract not being declared on, its breach does not constitute the cause of action, but the contract can be used merely as evidence of the indebtedness."). Thus, "[w]hen the authenticated invoice has been tendered into evidence in a suit on open account and is supported by testimony that the invoiced amount was unpaid, a prima facie case for the seller has been proven." *Imex*, 583 S.E.2d at 121. If a purchaser admits to having received the goods, it has the burden of proving that the amount on the invoice was incorrect or that there was no consideration for the goods. *Id.* North Continental does not dispute that it received the goods, that the amounts on BJB Electric's invoices are correct, or that

there was consideration for the goods it received.  Therefore North Continental is liable to BJB Electric for the entire amount due under the invoices.  *See id.*

BJB Electric's breach of contract claim is based on North Continental's tender of purchase orders and BJB Electric's subsequent shipment of goods that conformed with the orders.  Under Article 2 of the Georgia Uniform Commercial Code ("UCC"), the tender of purchase orders and shipment of goods satisfy the requirements for offer and acceptance, and a valid and enforceable contract is created.  *See* Ga. Code. Ann. § 11-2-206(a).  Therefore North Continental can also be held liable under a breach of contract theory.

North Continental asserts two purported defenses to BJB Electric's claims.  First, North Continental argues that BJB Electric is not entitled to payment because BJB Electric has breached the Lighting Agreement and Appliance Agreement.  The court need not consider this argument because it has already determined that neither agreement created an enforceable contract with BJB Electric.  Second, North Continental argues that there is a genuine issue of material fact as to damages because BJB Electric's claims under the unpaid invoices must be offset by $66,083.24, the amount North Continental attributes to increased quality checks and lost profits due to BJB Electric's prior shipments of poor quality goods.  BJB Electric responds that, under Georgia law, North Continental's claim for "recoupment" is not a defense to liability and cannot defeat a motion for summary judgment on an underlying contract.

As a threshold issue, the parties have failed to carefully delineate between the doctrines of setoff, recoupment, and deduction.  *See generally Coplay Cement Co.* v. *Willis & Paul Grp.*, 983 F.2d 1435, 1440–41 (7th Cir. 1993) (discussing the equitable origins of the doctrine of setoff as compared to recoupment); *Crow* v. *Mothers Beautiful Co.*, 156 S.E.2d 193, 194 (Ga. App.

18

1967) (discussing the difference between setoff and recoupment); William D. Hawkland, 2 *Hawkland UCC Series* § 2-717:1 (discussing the difference between deduction and recoupment). The Georgia Code provides that setoff "allows the defendant to set off a debt owed him by the plaintiff against the claim of the plaintiff." Ga. Code. Ann. § 13-7-1. "[A]ny mutual demands" between the parties that existed at the time the suit was filed may be subject to a setoff. *Id.* § 13-7-5. The Georgia Code defines recoupment as "a right of the defendant to have a deduction from the amount of the plaintiff's damages" where the plaintiff has not complied with obligations "arising under the contract upon which suit is brought." *Id.* § 13-7-2. The Georgia UCC provides for a similar remedy, sometimes referred to as "deduction," which allows the buyer, upon notification to the seller, to "deduct all or any part of the damages resulting from any breach of the contract from any part of the price still due under the same contract." *Id.* § 11-2-717. The key difference between the various doctrines is that setoff does not need to arise from a breach of the contract at issue in the plaintiff's suit, whereas recoupment and deduction do.

North Continental does not argue that the $66,083.24 allegedly owed by BJB Electric arises from the same invoices or purchase orders that provide the basis for North Continental's claims. The conduct North Continental complains of appears to predate the invoices at issue by one to two years. While it is conceivable that all of North Continental's purchase orders might be construed as a single contract, the court is not aware of any Georgia case that addresses this issue. *Cf. Coplay*, 983 F.2d at 1439–40 (concluding that two purchase orders were two separate contracts under Indiana law). In any event, the record does not disclose the way in which the allegedly nonconforming goods and assembly line were ordered by North Continental and therefore the court cannot determine whether the same type of purchase orders were even at

issue. Therefore the court concludes that North Continental is not claiming amounts allegedly due under the same contracts that give rise to BJB Electric's suit, and the only applicable doctrine is setoff as defined under the Georgia Code.

The Georgia Code makes clear that "[s]etoff does not operate as a denial of the plaintiff's claim." Ga. Code. Ann. § 13-7-1; *see also T.V. Tempo, Inc.* v. *T.V. Venture, Inc.*, 355 S.E.2d 76, 78–79 (Ga. Ct. App. 1987) (setoff is a counterclaim for affirmative relief rather than a defense to liability). Rather than disregard North Continental's argument entirely, as BJB Electric suggests, the court will redesignate the defense as a permissive counterclaim under Rule 13(b).[10]  *See* Fed. R. Civ. P. 8(c)(2) ("If a party mistakenly designates a . . . counterclaim as a defense, the court must, if justice requires, treat the pleading as though it were correctly designated, and may impose terms for doing so."); *Coplay*, 983 F.2d at 1440 (noting that setoff is the ancestor of the permissive counterclaim); *Crow*, 156 S.E.2d at 194 ("Setoff is not compulsory and a defendant may elect between (a) bringing a separate suit for his demand, or (b) setting it off against the plaintiff's." (citation and quotations omitted)). This does not, however, preclude the court from granting BJB Electric's motion for summary judgment as to claims which are factually separate from North Continental's counterclaim. Accordingly, BJB Electric's motion for summary judgment as to Counts I and III of its complaint will be granted. BJB Electric's motion for summary judgment will be denied to the extent it would include North Continental's setoff counterclaim.

**B.    Unjust Enrichment**

---

[10] North Continental asserted its offset "defense" in its answer to BJB Electric's amended complaint. (*See* Dkt. #20 ¶ 10 ("Admit that it received invoices but denies the amount claimed is the amount due to BJB Electric because the amount claimed is subject to offset by virtue of NCE's counterclaims as well as by . . . two (2) debit invoices from NCE to BJB Electric.").)

BJB Electric does not move for summary judgment on its unjust enrichment claim, which is based on the value of the benefit North Continental received from goods it did not pay for. BJB Electric admits that its unjust enrichment claim will be moot if summary judgment is granted on its open account action or breach of contract claim. Therefore Count II will be dismissed as moot.

### C.     Prejudgment Interest

The Georgia Code provides that the owner of a "commercial account" is entitled to statutory interest at a rate of 1½ percent per month, or 18 percent per year, on accounts that have been due and payable for more than 30 days. Ga. Code. Ann. § 7-4-16. A "commercial account" is defined as "an obligation for the payment of money arising out of a transaction to sell or furnish, or the sale of, or furnishing of, goods or services other than a 'retail installment transaction.'" *Id.* Statutory pre-judgment interest may be applied only to liquidated claims. *Patton* v. *Turnage*, 580 S.E.2d 604, 609 (Ga. Ct. App. 2003). "A liquidated claim is an amount certain and fixed, either by the act and agreement of the parties or by operation of law; a sum which cannot be changed by the proof." *Id.* (citation omitted).

BJB Electric contends that it is entitled to statutory interest at the rate of 18 percent per year beginning on May 24, 2009 for the balance due on the five outstanding invoices. North Continental does not contest that BJB Electric's calculations or that the outstanding invoices constitute a commercial account under the Georgia Code. Rather, it asserts that BJB Electric is not entitled to pre-judgment interest because the damages are not liquidated. Because North Continental has asserted no valid defenses as to the amounts owed under invoices, however, the invoices constitute due and payable liquidated debt. *See Hampsire Homes, Inc.* v. *Espinosa*

*Constr. Servs., Inc.*, 655 S.E.2d 316, 319 (Ga. Ct. App. 2007) ("Thus, we have repeatedly held

that a commercial account at issue is liquidated (and therefore subject to pre-judgment interest)

even though the defendant has unsuccessfully contested the amount due."). The debt would still

be considered liquidated and subject to pre-judgment interest if it were offset by a counterclaim

amount. *See id.*; *Haygood* v. *Smith*, 56 S.E.2d 310, 314 (Ga. Ct. App. 1949) (final balance of

agreement constituted liquidated demand subject to pre-judgment interest, and setoff items

"would only reduce the net balance of the plaintiff's liquidated demand"). BJB Electric's

motion for summary judgment as to its claim for statutory prejudgment interest will be granted.

### D.    Litigation Expenses

Finally, BJB Electric seeks litigation expenses pursuant to Georgia Code § 13-6-11,

which provides that expenses of litigation are recoverable "where the defendant has acted in bad

faith, has been stubbornly litigious, or has caused the plaintiff unnecessary trouble and expense."

BJB Electric asserts it is entitled to litigation expenses because North Continental has not

asserted any viable defenses to its claims. Under these circumstances, BJB Electric is entitled to

litigation expenses only if there is no "bona fide controversy" as a matter of fact. *See Universal

Underwriters Grp.* v. *S. Guar. Ins. Co.*, 677 S.E.2d 760, 762 (Ga. Ct. App. 2009); *see also

Joyner* v. *Raymond James Fin. Servs., Inc.*, 602 S.E.2d 871, 876 (Ga. Ct. App. 2004) ("[T]he

mere refusal to pay a disputed claim is not the equivalent of stubborn litigiousness or causing

unnecessary trouble and expense as contemplated under the statute." (citation omitted)). Given

the facts giving rise to North Continental's demand for setoff, and the complicated business

relationship between the parties that gave rise to North Continental's other counterclaims, the

22

court is not convinced that there was no bona fide controversy in this case. BJB Electric's

motion for summary judgment as to its request for litigation expenses will be denied.

## CONCLUSION AND ORDER

BJB Electric's motion for summary judgment [#128] is granted in part and denied in part.

Judgment is entered in favor of BJB Electric as to Counts I, III, and IV of the amended

complaint. Count II of the amended complaint is dismissed as moot. Judgment is entered in

favor of BJB Electric as to North Continental's counterclaims for breach of the Lighting

Agreement, breach of the Appliance Agreement, and violation of the Wisconsin Fair Dealership

Law. This case is set for a status hearing on 9/18/2012 at 8:30 a.m. The parties are instructed to

engage in a sincere effort to resolve this litigation and to report on these efforts at the status

hearing.

Dated: August 28, 2012        Enter:_____

                        JOAN HUMPHREY LEFKOW
                        United States District Judge